```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

| | |
|---|---|
| **BRIAN NELSON, PATRICK NELSON, and NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC,**<br><br>    Plaintiffs,<br><br>    v.<br><br>**FREEBORN & PETERS, LLP,**<br><br>    Defendant. | **Case No. 11 C 1277**<br><br>Hon. Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Freeborn & Peters, LLP's Motion for Summary Judgment (ECF No. 52). For the reasons stated herein, the Motion is denied.

### I. BACKGROUND

Except where indicated, the parties agree to the following facts. This case stems from Plaintiffs' attempt to acquire the Algonquin Galleria ("Algonquin"), an Illinois shopping center. Plaintiff Nelson Brothers Professional Real Estate LLC ("NB") is a California company whose members are Plaintiffs Patrick and Brian Nelson, also of California. Defendant Freeborn & Peters, LLP (hereinafter, "Defendant" or "Freeborn") is an Illinois law firm.

**A. Plaintiffs Are Introduced to the Algonquin Transaction**

In March 2008, Burt Follman ("Follman") and Alliance Equities, LLC ("Alliance Equities"), of which Ben Reinberg ("Reinberg") was a member, retained Freeborn to assist them in acquiring Algonquin. The

goal was to sell Tenant-in-Common ("TIC") interests to investors. They retained Freeborn as counsel to assist with the acquisition of the property, the structure and sale of TIC interests, and the adoption of the TIC structure for the property. Edward J. Hannon ("Hannon"), a partner at Freeborn, was principally responsible for the engagement. As part of this engagement, Freeborn assisted in organizing a number of additional business entities necessary to effectuate the closing of the real estate acquisition. Such entities included Alliance Equities Real Estate, LLC ("AERE"), which had Reinberg and Follman as its members. Freeborn also assisted in organizing Alliance NW Chicago, LLC ("Alliance NW") and Randall Holdings, LLC ("Randall Holdings"). The Articles of Organization for Alliance NW were filed around March 19, 2008. Randall Holdings was formed on May 1, 2008 as a single purpose entity to hold the TIC interests that were not sold to TIC investors in connection with the acquisition closing and that would be sold post-closing to subsequent TIC investors.

Initial efforts to secure TIC investors fell short of the funds needed to acquire the shopping center. In June 2008, Reinberg and Follman were referred to the Nelsons. The Nelsons had experience with approximately 15 prior efforts to raise TIC investments. The Nelsons agreed to enter into a joint venture with Reinberg and Follman through their wholly-owned companies, NB and AERE. Under the agreement, NB and AERE would each own 50% of the previously formed

Alliance NW. Alliance NW, in turn, was the sole member of Randall Holdings, which would acquire title to Algonquin.

In late July 2008, the Nelsons flew to Chicago and met Follman and Reinberg at the property to do their "due diligence." Def.'s Rule 56.1 Statement of Facts ¶ 34, ECF No. 58. While they did not discuss terms of the deal at that time, they discussed the possibility of continuing to have Freeborn handle the acquisitions. The Nelsons met with Follman, Reinberg and Hannon that evening for dinner. The parties dispute what was actually discussed at this meeting. Hannon described the meeting as a social meeting. Patrick Nelson testified that the parties discussed some aspects of the acquisition, and that Hannon indicated Freeborn could handle all aspects of the transaction. Patrick Nelson did not believe he had finalized terms of an agreement for his company's involvement in the project at that point, but that if there was a deal, Freeborn would "handle all of the offering materials and essentially help us to bring it to the market." *Id.* ¶ 38. Plaintiffs decided eventually to become involved in the venture.

Patrick Nelson testified that he then had a telephone conversation with Hannon in which Hannon consented to represent Plaintiffs in the transaction. Patrick Nelson testified that Plaintiffs usually used a California law firm for their real estate and corporate matters, but Hannon convinced them that Freeborn could satisfy all of their legal needs. Plaintiffs claim that, based on these representations, they did not retain the California law firm

and sought legal advice only from Freeborn. Defendant denies being retained by Plaintiffs at this point, and denies making any effort to convince Plaintiffs to retain or refrain from retaining counsel. A letter of engagement was not signed at this time.

### B. The Alliance NW Operating Agreements

Freeborn prepared the Alliance NW Operating Agreement (the "Operating Agreement"), which was signed by Reinberg for AERE and Patrick Nelson for NB around July 29, 2008. Under the agreement, AERE was to negotiate a real estate purchase agreement for Algonquin, obtain a $16 million acquisition loan for the property from its mortgage lender, and supervise the preparation of documents related to the sale of TIC interests. NB's responsibilities included supervising the process of selling TIC interests, obtaining mezzanine financing for the acquisition that would not have recourse to AERE or its members, providing guaranties or accepting recourse exposure as may be required by a mezzanine lender and supervising the closing of the sale of TIC interests. Section 13.15 provided a list of contacts and addresses where notices and communications were to be sent under the agreement. For NB, only its California address was listed. For AERE, however, a copy was also to be sent to Hannon at Freeborn's Chicago office.

Section 4.2 of the Operating Agreement provided for three Managers – Patrick Nelson, Follman and Reinberg. Patrick Nelson claims that when he asked Hannon why there were three Managers instead of four, Hannon responded that it would be easier for the

Chicago Managers to deal with the "smaller decisions." *Id.* ¶ 42. Nelson claims that Hannon reassured him that the control was still shared equally. Section 4.3 contemplates that both NB and AERE had to approve an expenditure of more than $50,000, whereas only two Managers could authorize an expenditure less than that.

At the request of the mezzanine lender, the Operating Agreement was later amended. However, the amendments did not change the terms described above.

### C. The Mezzanine Loan and Security Agreement

The $16 million mortgage loan commitment procured by AERE was to expire August 29, 2008, a month after the parties signed the Operating Agreement. Because of the short turnaround, Patrick Nelson testified that he believed there would only be one viable source of mezzanine financing available for the transaction, Jeffrey Donner ("Donner"). One of Donner's companies sent a Term Sheet to NB on August 1, 2008. The Term Sheet contemplated a mezzanine loan of $5.25 million to facilitate purchase of the property, with a maturity of six months. The lender, at its option and for a fee, could extend the maturity for two successive three-month terms, thus allowing for the possibility of maturity dates nine or twelve months after closing. The Nelsons were also to provide "bad boy" guaranties, though the Term Sheet did not define that phrase. *Id.* ¶ 58.

On August 18, 2008, Defendant forwarded Patrick Nelson a draft contract from the mezzanine lender that included a provision for guaranties by the Nelsons. The agreement called for exposure of the

entire amount of the mezzanine loan in the event a monthly installment of interest was not paid. Defendant asked Patrick Nelson to review the draft and provide any changes. While Patrick Nelson did not recall reading the guaranty provision, he did read the term calling for exposure for the entire mezzanine loan if a monthly interest payment was not met.

On August 27, 2008, Defendant advised Patrick Nelson that the lender required an opinion letter from Plaintiffs' counsel covering the enforceability of the guaranties. Defendant specifically stated "[w]e do not represent the guarantors in this transaction." *Id.* ¶¶ 66-67. Plaintiffs subsequently signed an engagement letter to have Freeborn represent them in connection with the opinion letter. The Nelsons then executed the mezzanine lender's Loan and Security Agreement, which contained the "Limited Guaranty" that the Nelsons would guaranty payment of all amounts due under the mezzanine loan if any monthly interest payment was not timely made. The transaction to acquire Algonquin closed on August 29, 2008.

### D. Discovery of Mechanics' Liens

Prior to closing, Freeborn took measures against the possibility of mechanics' liens on the property. This included obtaining (1) protections against the possibility of mechanics' liens; (2) an indemnification agreement from the seller for existing or future mechanics' liens claims; and (3) a warranty from the seller to defend title against existing and future lien claims. Subsequent to the closing, Plaintiffs discovered that the property had several

mechanics' liens on it.  Freeborn referred the mechanics' lien issues to the seller and title company for indemnification.

### E.  The $49,999 payment to Freeborn

In February 2009, Reinberg decided that a portion of the outstanding attorneys' fees owed to Freeborn should be paid out of the proceeds of an impending closing for the sale of TIC interests in the shopping center.  The Nelsons disagreed, but Reinberg and Follman decided to pay $49,999 (one dollar under the $50,000 threshold requiring unanimous approval under the Operating Agreement) to Freeborn.  This prompted a letter from the mezzanine lender asking for an explanation for the payment to determine if it was made in violation of the Loan Agreement.

In March 2009, the original maturity date of the mezzanine loan was extended for three months.  Although the mezzanine loan agreement specified a fee of 1.5% of the loan balance as the price for the extension, the lender demanded a 3% fee, which the Plaintiffs paid. In June 2009, the mezzanine lender declined to grant a second three-month extension, and declared the loan due.  The mezzanine lender then took over the project.

### F.  Plaintiffs File Suit

Plaintiffs filed this legal malpractice action on February 23, 2011.  Plaintiffs accuse Freeborn of favoring the interests of the Alliance entities over Plaintiffs' interests and performing negligently at different stages of the venture.  Defendant now moves for summary judgment.

## II. **LEGAL STANDARD**

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006). A fact presents a genuine issue if it is one on which a reasonable fact finder could find for the nonmoving party. *Id.*

## III. **ANALYSIS**

The parties do not contest that Illinois law governs this dispute. In Illinois, a plaintiff asserting a legal malpractice claim must prove: (1) the defendant attorney owed the plaintiff client a duty of due care arising from an attorney-client relationship; (2) the attorney breached that duty; (3) the client suffered an injury in the form of actual damages; and (4) the actual damages resulted as a proximate cause of the breach. *Bourke v. Conger*, 639 F.3d 344, 347 (7th Cir. 2011). An attorney-client relationship arises only when both the attorney and the client have consented to its formation. *Wieboldt Stores, Inc. v. Schottenstein,* No. 87 C 8111, 1991 U.S. Dist. LEXIS 13004 at *11 (N.D. Ill. Sept. 16, 1991). "The client must manifest his authorization that the attorney act on his behalf, and the attorney must indicate his acceptance of the power to act on the client's behalf." *Id.*

Once an attorney-client relationship is formed, the attorney owes a duty of care to its client. "The duty of care required of an

attorney toward his or her clients is to exercise a reasonable degree of care and skill in representing them." *Pippen v. Pedersen,* No. 1-11-1371, 2013 Ill. App. LEXIS 92 at *16 (Ill. App. Ct., Feb. 26, 2013). The determination of whether an attorney has exercised a reasonable degree of care and skill is a question of fact. *Mayol v. Summers, Watson & Kimpel,* 585 N.E.2d 1176, 1183 (Ill. App. Ct. 1992).

It is not enough for a client to simply demonstrate that its attorney breached a duty it owed. *N. Ill. Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 837 N.E.2d 99, 107 (Ill. 2005). Even if negligence is established, no action will lie against the attorney unless that negligence proximately caused damage to the client. *Id.* "A plaintiff bringing a legal malpractice claim must establish that but for the attorney's negligence plaintiff would not have suffered an injury." *Fawcett v. Ditkowsky,* No. 90 C 6402, 1993 U.S. Dist. LEXIS 9812 at *48 (N.D. Ill. July 16, 1993). Generally, proximate causation involves issues of fact that preclude the granting of summary judgment. *Id.* at *49. "The issue of proximate causation should never be decided as a matter of law where reasonable persons could reach different results." *Nettleton v. Stogsdill*, 899 N.E.2d 1252, 1262 (Ill. App. Ct. 2008).

Actual damages are never presumed in a legal malpractice action. *N. Ill. Emergency Physicians*, 837 N.E.2d at 107. Such damages must be affirmatively established. *Id.* If the client cannot demonstrate that he sustained a monetary loss as a result of his lawyer's negligent act, he cannot prevail. *Id.* "Where the mere possibility

attorney toward his or her clients is to exercise a reasonable degree of care and skill in representing them." *Pippen v. Pedersen,* No. 1-11-1371, 2013 Ill. App. LEXIS 92 at *16 (Ill. App. Ct., Feb. 26, 2013). The determination of whether an attorney has exercised a reasonable degree of care and skill is a question of fact. *Mayol v. Summers, Watson & Kimpel,* 585 N.E.2d 1176, 1183 (Ill. App. Ct. 1992).

It is not enough for a client to simply demonstrate that its attorney breached a duty it owed. *N. Ill. Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 837 N.E.2d 99, 107 (Ill. 2005). Even if negligence is established, no action will lie against the attorney unless that negligence proximately caused damage to the client. *Id.* "A plaintiff bringing a legal malpractice claim must establish that but for the attorney's negligence plaintiff would not have suffered an injury." *Fawcett v. Ditkowsky,* No. 90 C 6402, 1993 U.S. Dist. LEXIS 9812 at *48 (N.D. Ill. July 16, 1993). Generally, proximate causation involves issues of fact that preclude the granting of summary judgment. *Id.* at *49. "The issue of proximate causation should never be decided as a matter of law where reasonable persons could reach different results." *Nettleton v. Stogsdill*, 899 N.E.2d 1252, 1262 (Ill. App. Ct. 2008).

Actual damages are never presumed in a legal malpractice action. *N. Ill. Emergency Physicians*, 837 N.E.2d at 107. Such damages must be affirmatively established. *Id.* If the client cannot demonstrate that he sustained a monetary loss as a result of his lawyer's negligent act, he cannot prevail. *Id.* "Where the mere possibility

of harm exists or damages are otherwise speculative, actual damages are absent and no cause of action for malpractice yet exists." *Id.*

Plaintiffs contend that Freeborn committed malpractice at three different junctures during the Algonquin venture. The first involves the drafting of the operating agreements. The second involves the review of the mezzanine loan agreement. The third involves its title check for any liens on the property. Each will be discussed below with respect to the necessary elements of the legal malpractice claim just described.

### A. Drafting of the Operating Agreements

Plaintiffs argue that Freeborn drafted the Alliance NW Operating Agreements "to favor its clients, the Alliance joint venturers (Reinberg and Follman), over its other clients, Plaintiffs." Pls.' Mem. in Opp. to Summ. J. at 11, ECF No. 60. The first question is whether there is a genuine issue of material fact as to whether there was an attorney-client relationship at the time Freeborn was preparing these agreements. The Court finds that there is. On the one hand, it is undisputed that the parties did not enter into a written engagement letter when the work began. In addition, the notice provisions of the operating agreements listed Freeborn as counsel for AERE, and not for NB. Plaintiffs, on the other hand, counter with statements they claim Hannon made during their July dinner in Chicago offering Freeborn's services for the deal, as well as a telephone conversation shortly thereafter in which he acknowledged that Freeborn would be representing Plaintiffs. A

reasonable person may also view Defendant's conduct in working with Plaintiffs throughout the transaction as indicative of an attorney-client relationship.

This Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Wieboldt,* 1991 U.S. Dist. LEXIS 13004 at \*11. Plaintiffs raise a genuine issue of material fact as to whether Freeborn represented them earlier in the transaction than the August 2008 engagement letter.

With respect to whether Defendant breached duties to Plaintiffs, attorneys owe their clients a duty of care that entails the exercise of a reasonable degree of care and skill in representing them. *Pippen,* 2013 Ill. App. LEXIS 92 at \*16. In addition, attorneys may not represent a client if there is a potential conflict of interest unless it discloses that interest and obtains the client's consent. Ill. Sup. Ct. R. Prof'l Conduct 1.7. Indeed, the comments to Supreme Court Rule of Professional Conduct 1.7 addresses specifically a scenario of an attorney being asked to represent individuals seeking to create a joint venture likely creates a conflict of interest:

> For example, a lawyer asked to represent several individuals seeking to form a joint venture is likely to be materially limited in the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client.

*Id.,* cmt. 8.

If Plaintiffs establish there was an attorney-client relationship, a reasonable person could find that Freeborn breached its duty of care in representing Plaintiffs. No party has presented any evidence that there were discussions of conflicts of interest or informed consent at the outset of the transaction. Hannon testified that he did not encourage Plaintiffs to retain or refrain from retaining counsel.

In seeking to establish that Freeborn drafted the agreements to favor Reinberg and Follman, Plaintiffs turn to the terms of the agreements themselves. For example, under the agreements, Reinberg and Follman were two of the three Managers of Alliance NW and thus had the authority to bind the company to certain decisions without Patrick Nelson's support. However, Plaintiffs reviewed the operating documents and had conversations with Freeborn seeking explanation for some of the provisions Plaintiffs now claim were negligently drafted. The Court finds there is a genuine issue of material fact as to whether Freeborn breached any duties it owed to Plaintiffs.

An attorney's breach of duty, however, must cause harm to the plaintiff to be actionable. *N. Ill. Emergency Physicians*, 837 N.E.2d at 107. Plaintiffs argue two ways in which Freeborn's alleged negligent drafting of the operating agreements caused them harm.

Plaintiffs first argue that they never would have entered into the venture or contributed $1.3 million under the circumstances had they known that Freeborn's counsel was inadequate in its (1) drafting of the agreements; (2) in advising Plaintiffs of the risks associated

with the agreements; and (3) in representing other parties' interests more zealously than Plaintiffs. The venture, of course, failed, and Plaintiff lost its investment. That is not in dispute. There are, however, genuine issues of fact as to whether the Plaintiff would have entered into the transaction even if it had been explained more thoroughly. Plaintiffs offer testimony that they would not have engaged Freeborn had they been aware of all this. However, Patrick Nelson acknowledged that he read the agreements, and that Hannon reviewed the provisions with him. While Plaintiffs complain about the provision allowing only two Managers to make certain decisions for the company, Defendants offer NB's own Operating Agreement, which contains a similar provision to which Plaintiffs clearly did not object. Defendants also offer evidence of potential intervening causes that may have led to Plaintiffs' loss, including Plaintiffs' own experts' statements regarding the effect the 2008 financial collapse had on real estate transactions. *See Dean v. Watson,* No. 93 C 1846, 1996 U.S. Dist. LEXIS 2243 at *15-16 (N.D. Ill. Feb. 16, 1996) (statements by a party's expert constitute a party admission). The Court nonetheless finds this sufficient to indicate there are issues of material fact with respect to whether Freeborn's alleged breach of duty led to Plaintiffs' losses in the venture.

A second claim for damages caused by Freeborn's alleged malpractice stems specifically from Section 4.3 of the operating agreements. The provision allowed for a majority of the three managers to make expenditures of less than $50,000. This, Plaintiffs

claim, favored Reinberg and Follman, since they were two of the three Managers. Plaintiffs claim this favorable drafting led to them being injured. When Alliance NW made the $49,999 payment to Freeborn, the mezzanine lender contacted them requesting an explanation of the payment, since it appeared to be in violation of the mezzanine loan agreement. This led to Plaintiffs having to pay the mezzanine lender $120,000 instead of the $75,000 contemplated in the contract to get a three-month extension on the loan maturity. Plaintiff's attribute this extra $45,000 they had to pay to Freeborn's drafting of the agreement in favor of the Alliance joint venturers, who had the authority under the agreement to outvote Patrick Nelson for such a payment. Freeborn, however, offers evidence to break the causal chain. This includes the fact that Hannon and Patrick Nelson reviewed that provision, and that the increase in the fee was a business decision made by the lender. Again, however, such facts are sufficient to establish a genuine issue of fact as to whether Freeborn caused Plaintiffs to suffer damages due to the increased fee.

### B. The Guaranty

Plaintiffs also claim that Freeborn was negligent in failing properly to counsel Plaintiffs with respect to the mezzanine loan agreement. Plaintiffs claim that the guaranties in the Term Sheet were limited to "bad boy" behavior, but that the guaranties found in Section 7.1 of the Loan and Security Agreement were far broader. For

example, the loan became due in full if a monthly interest payment was not paid on time.

Plaintiffs assert that Freeborn had a duty to disclose the unlimited scope of the guaranty and the financial risk they faced in the event of a default on the mezzanine loan based just on the late payment of interest. Defendants deny that it owed any duty to Plaintiffs with respect to the mezzanine loan agreement, and that it was only engaged with respect to providing an opinion letter regarding the enforceability of their limited guaranties to the mezzanine lender.

As with the allegations regarding the operating agreements, the question of whether there was an attorney-client privilege is one of material fact. However, there is the added fact that Freeborn and Plaintiffs executed an engagement letter for Freeborn to provide legal services to Plaintiffs with respect to providing the opinion letter. With respect to whether Freeborn breached its duty of care, Plaintiffs offer the testimony of Defendant's expert, Samuel P. Gussis, who testified that if an attorney-client relationship existed, Freeborn should have discussed the guaranties with the client. Pls.' Resp. 56.1 Statement of Facts ¶ 24. Defendants highlight the fact that Plaintiffs' review and input of the loan agreement was requested, and they made no objections with respect to the guaranty provisions. There is thus a genuine issue of material fact with respect to whether Freeborn breached any duties to Plaintiffs.

Plaintiffs argue that their damages as a result of Freeborn's alleged negligence are "certain" because the Nelsons are exposed to suit on the guaranties. Pls.' Mem. in Opposition to Summ. J. at 13. Plaintiffs also hired attorneys to counsel them on the loan documents, which they claim they would not have needed but for Freeborn's negligence. However, it is clear Plaintiffs cannot recover for their claimed potential liability of $5,000,000 to the mezzanine lender for the full loan. "Where the mere possibility of harm exists or damages are otherwise speculative, actual damages are absent and no cause of action for malpractice yet exists." *N. Ill. Emergency Physicians*, 837 N.E.2d at 107. The record makes it clear that Plaintiffs have not sustained an actual $5,000,000 loss to the mezzanine lender, since the lender has not filed suit seeking that money and may never do so. In addition, Plaintiffs have a causation problem, since they admit that they made all of their monthly interest payments on due dates. The event described in the provision of which Plaintiffs complain simply never happened.

There is, however, a question of fact with respect to any attorneys' fees that Plaintiffs may have incurred after it retained other counsel to advise them on the true breadth of the guaranties. "[A] legal malpractice plaintiff may recover as actual damages the attorney fees incurred as a result of the defendant's malpractice, so long as the plaintiff can demonstrate she would not have incurred the fees in the absence of the defendant's negligence." *Nettleton,* 899 N.E.2d at 1261. Defendant's expert, Samuel P. Gussis, acknowledged

that Plaintiffs incurred costs as a result of their subsequent review of the guaranties. Pls.' Resp. 56.1 Statement of Facts ¶ 32. While Patrick Nelson testified he had reviewed the agreement, he also stated that he was not a lawyer and relied on the advice of counsel with respect to explaining contract terms and potential risks. If the jury found that Defendants had breached a duty of care to Plaintiffs in failing to explain the loan agreement, it may find that the breach caused Plaintiffs damages in the form of the additional attorneys' fees incurred hiring someone else.

### C. Mechanics' Liens

Finally, Plaintiffs claim that Freeborn failed negligently to address mechanics' liens on the property. Subsequent to closing the transaction, Plaintiffs discovered that the property had several mechanics' liens on it. Plaintiffs claim that Defendants failed to inform them of the liens and allowed the deal to close without adequate protection. Plaintiffs claim the liens adversely affected the loans. Freeborn denies that it mishandled the mechanics' liens or that Plaintiffs incurred any damages as a result of how those liens were handled.

The parties' arguments and support on this matter are more cursory than the other two allegations of malpractice. As discussed previously, there is a genuine issue as to whether there was an attorney-client relationship prior to closing that would have obligated Freeborn to inform Plaintiffs of these liens. The parties offer expert testimony as to whether or not Freeborn had breached any

duties it may have had. For example, Freeborn's expert points out that prior to closing, Freeborn acquired (1) title insurance for recorded and unrecorded liens; (2) an indemnification agreement from the seller for existing or future mechanics' liens claims; and (3) a warranty from the seller to defend title against existing and future lien claims. Plaintiff's expert counters that Freeborn should have disclosed these liens prior to closing, as they might have affected whether Plaintiffs participated in the transaction.

Where the parties seem to disconnect is on the question of causation and damages. The parties agree that the title insurance policy imposed a duty on the title insurer to defend and indemnify the purchaser for recorded and unrecorded liens. They agree that Freeborn referred mechanics' lien issues to the seller and the title company for indemnification. Defendant relies on this, as well as Patrick Nelson's testimony that after the mezzanine lender took over the project they did not get sued by the mortgage lender, to argue that Plaintiffs suffered no damages from the liens. Indeed, Defendants' expert testified that any injury from the mechanics' liens would have fallen to the title-holder (Randall Holdings), and not to Plaintiffs. But Plaintiffs do not appear to be seeking to establish that the mechanics' liens injured them by causing the mortgage lender to foreclose. Instead, similar to their contentions with respect to the operating agreements, Plaintiffs seek to establish that they may not have pursued the venture at all had they known about the mechanics' liens. They offer testimony to this

effect from their expert, William Sharp. They also rely on Patrick Nelson's testimony that two investors were delayed in closing for six months as a result of the liens. A reasonable person may conclude that such delay caused injury to Plaintiffs because of the time sensitive circumstances in which the parties were operating to get the transaction off the ground. The Court concludes that there are genuine issues of material fact as to whether Defendants' handling of the mechanics' liens was negligent, and whether Defendants suffered harm as a result.

Defendant has failed to establish that there are no genuine issues of material fact with respect to Plaintiffs' malpractice claim. As such, the Court declines to grant summary judgment in its favor.

### IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (ECF No. 52) is denied.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Court

Date:4/16/2013